UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

CATHY WATKINS,

                  Plaintiff,           <u>COMPLAINT</u>

      -against-             Civil Action No.

CITY OF NEW YORK, MICHAEL DONNELLY
(Tax ID #883801), THOMAS AIELLO
(Tax ID #868427), ANNABELLE NIEVES     <u>JURY TRIAL</u>
(Tax ID #876782), Individually and as   <u>DEMANDED</u>
Members of the New York City Police
Department (NYPD), and John Does #1-
10,

                Defendants.

-------------------------------------X

    Plaintiff Cathy Watkins, by and through her attorneys Paul Casteleiro, Esq., and W. James Cousins, Esq., complaining of the defendants, states as follows:

INTRODUCTION

    1.  Plaintiff Cathy Watkins was wrongly convicted in 1997 of felony murder in connection with the shooting death of Baithe Diop, a livery cabdriver. She was sentenced to an indeterminate term of imprisonment of 25 years to life and spent almost 18 years in jail for a murder she did not commit and was not connected to in any way.

    2.  Ms. Watkins' conviction was not the result of innocent or even negligent mistakes and was not accidental but the direct result of the conduct of a group of New York City Police Department Detectives, named and as yet unnamed, assigned to the Bronx Homicide Unit who fabricated evidence and false witness testimony.

3.    Ms. Watkins was tentatively freed from imprisonment on October 24, 2012 and her conviction was vacated and the indictment dismissed on December 13, 2012 after it was revealed by the United States Attorney's Office for the Southern District of New York that two of its cooperating witnesses admitted to acting alone in committing the murder of the livery cabdriver and had pled guilty to federal offenses in connection with the shooting death of the livery cabdriver.

<u>JURISDICTION</u>

4.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over claims arising under 42 U.S.C. § 1983.

5.    Supplemental jurisdiction over Ms. Watkins' state law claims exists pursuant to 28 U.S.C. § 1367(a).

6.    Ms. Watkins has complied with the requirements of New York General Municipal Law Section 50-i by serving a notice of claim on City of New York Office of The Comptroller on January 18, 2013, within the time required by New York General Municipal Law Section 50-e. More than 30 days have elapsed since the service of that notice and no offer of settlement has been made.

7.    At the request of the City of New York Office of the Comptroller on April 26, 2013, Ms. Watkins submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

<u>VENUE</u>

8.    Pursuant to 28 U.S.C. § 1391(b) venue is proper in the

Southern District of New York, the judicial district in which the claims arose.

JURY DEMAND

9.    Pursuant to the Seventh Amendment of the United States Constitution, the plaintiff requests a jury trial on all issues and claims set forth in this complaint.

PARTIES

10.   PLAINTIFF CATHY WATKINS was at all times material to this complaint a citizen and resident of the State of New York. She is currently a citizen of the State of Maryland residing in Clinton, Maryland.

11.   DEFENDANT CITY OF NEW YORK is a political subdivision of the State of New York existing by virtue of the laws of the State of New York.

12.   The DEFENDANT MICHAEL DONNELLY [hereinafter, "Defendant Donnelly"], Tax I.D. No. 883801, at all times relevant to this complaint was a duly appointed and acting police officer of the New York City Police Department, an agency of the Defendant City of New York, with the rank of detective acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

13.   The DEFENDANT THOMAS AIELLO [hereinafter, "Defendant Aiello"], Tax I.D. No. 868427, at all times relevant to this

complaint was a duly appointed and acting police officer of the New York City Police Department, an agency of the Defendant City of New York, with the rank of detective acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

14.   The DEFENDANT ANNABELLE NIEVES [hereinafter, "Defendant Nieves"], Tax I.D. No. 876782, at all times relevant to this complaint was a duly appointed and acting police officer of the New York City Police Department, an agency of the Defendant City of New York, with the rank of detective acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

15.   DEFENDANTS JOHN DOE OFFICERS AND DETECTIVES #1-10, whose actual names the plaintiff has been unable to ascertain despite reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe," represent those officers and detectives in the New York City Police department acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York, who participated in the investigation that led to Ms. Watkins' wrongful conviction.

<u>ALLEGATIONS COMMON TO ALL CAUSES OF ACTION</u>

16.  The claimant Cathy Watkins was wrongfully charged, arrested, imprisoned, prosecuted and convicted for the murder of Baithe Diop despite the fact that she was actually innocent of the crime and had absolutely no connection to the crime.

17.  On January 19, 1995, at approximately 3:51 a.m., the New Harlem Car Service received a telephone call from a woman requesting a cab at 30 W. 141st Street, New York, New York to go to the Bronx. Baithe Diop, a Sengalese national and a livery taxi driver for New Harlem Car Service, was dispatched to respond to the call.

18.  At approximately 4:30 a.m. Baithe Diop was found dead, the victim of two gunshot wounds, in his work vehicle on Croes Avenue between Lafayette and Seward Avenues, Bronx, New York.

19.  The dispatcher at New Harlem Car Service, who received the call that Mr. Diop was dispatched to, told the police that the woman who called did not identify herself by name, but that she believed the voice was that of a customer who used the name of "Yvette."

20.  Ms. Watkins was never known by the name of "Yvette" and there existed no evidence that she ever used the name "Yvette."

21.  The Defendant Donnelly was assigned as the lead detective on the Diop murder case and he was assisted by the Defendants Aiello, Nieves and John Does #1-10.

22.  Two days after Mr. Diop's murder, on January 21, 1995, at approximately 7:25 p.m., Ms. Watkins' called the New Harlem Cab

Service to request a taxi and the dispatcher who answered the telephone thought Ms. Watkins' voice sounded like the woman she believed identified herself by the name Yvette.

23.  On January 21, 1995, the taxi Ms. Watkins called for picked her up outside her residence at 30 West 141st New York, New York.

24.  30 West 141st New York, New York is part of a residential apartment complex consisting of four 16 story buildings with each building having over 250 individual units.

24.  Pursuant to the Defendant Donnelly's instructions, the New Harlem Cab Service notified him that the person whose voice sounded like Yvette's had called.

25.  Ms Watkins was intending to go to a surprise birthday party and was going to pick up her cousin Devorah Rembert on her way to the party. The taxi drove Ms. Watkins to 67 Lennox Avenue, New York, New York where Ms. Rembert lived, but Ms. Rembert was not ready when Ms. Watkins arrived and the taxi was discharged. Once Ms. Rembert was ready, she and Ms. Watkins were about to begin the process of flagging down a cab when a New Harlem Cab Service taxi drove up to them and told them to get in. Within minutes after they got into the taxi it was stopped by the police. The two women were taken out of the taxi, which was searched, and they were handcuffed, searched and put into a police car. Ms. Watkins was told by the officers that detectives wanted to talk to her and the two women

were taken to the 28th Precinct. At the police station Ms. Watkins was questioned by the Defendants Donnelly and Aiello.

26. At all times during the investigation Ms. Watkins cooperated with the investigating officers, which included the Defendants Donnelly, Aiello and Nieves, as well as, various other detectives in the New York City Police Department whose identities are not presently known and are designated as John Does #1-10.

27. At the 28th Precinct Ms. Watkins told the defendants she did not call New Harlem Car Service for a taxi on January 19, 1995, at 3:51 a.m. to go to the Bronx and that she was in her apartment with her boyfriend Andrew Peters the entire evening of January 18, 1995, into the morning of January 19, 1995, when she went downtown with Ms. Rembert, whom she called Poona, to buy fabric.

28. Ms. Watkins' home telephone records confirmed that she did not call the New Harlem Car Service on January 19, 1995, at 3:51 a.m.; the records show that no call was made from her home to the car service on that date and time. The same telephone records established that Ms. Watkins did call the car service on January 21, 1995, requesting a taxi.

29. As part of her cooperation with the police Ms. Watkins permitted the Defendant Donnelly to take a Polaroid photograph of her while she was at the 28th Precinct and she agreed to the Defendant Donnelly's request for her to come to the 43rd Precinct in the Bronx the next day, January 22, 1995.

30. Upon Ms. Watkins' arrival at the 43rd Precinct, accompanied by her mother Evelyn Watkins, her stepfather Benjamin Howard, and Andrew Peters, who also was known by the name of Vernon Quinton, she was told to have a seat in a waiting area. Shortly after sitting down, a man, whom Ms. Watkins recognized as a driver for the New Harlem Car Service, and a woman came into the same waiting area and sat down. Ms. Watkins and the driver said hello to each other and the driver told the woman he was with that Ms. Watkins was "the girl." The woman, based on information and belief, was the alleged dispatcher who received the call to which Baithe Diop responded shortly before his death. Ms. Watkins was then called upstairs by Defendant Donnelly as were the driver and the woman with him. Ms. Watkins was put into a room with Defendant Donnelly. The driver and the alleged dispatcher were put into another room approximately 20 feet from Ms. Watkins' room. Ms. Watkins, without being told by the Defendant Donnelly that he was conducting an alleged voice identification test, asked her to make a telephone call. The Defendant Donnelly dialed a number which was to a telephone located in the room where the alleged dispatcher was waiting. After dialing the number the Defendant Donnelly told Ms. Watkins to ask for a cab and when the woman on the other end answered saying New Harlem Car Service Ms. Watkins asked for a cab. The woman asked Ms. Watkins where she wanted to go and Ms. Watkins, not knowing what to say, asked the Defendant Donnelly what should

she say and he immediately began screaming and cursing at Ms. Watkins, falsely accusing her of attempting to disguise her voice, bringing her to tears, and forcing her to hang up the telephone and redial. Ms. Watkins, in tears, redialed after the Defendant Donnelly told her to say she was going to "Randolph and Rosedale Avenue" and she followed his directions. The alleged dispatcher allegedly told the police Ms. Watkins' voice was the voice of the woman she associated with the name of "Yvette."

31.   The plaintiff Watkins, was told by the Defendant Donnelly that her voice was identified as the woman who called for a cab on January 19, 1995, at approximately 3:51 a.m. Ms. Watkins informed the Defendant Donnelly that it was impossible because she did not call the New Harlem Car Service on January 19, 1995, at approximately 3:40 a.m. to order a cab, that she was never known by the name of "Yvette," and that she was home in her apartment the entire evening of January 18, 1995, until the morning of January 19, 1995, when she left with her cousin to buy fabric.

32.   Despite Ms. Watkins' repeated and persistent denials that she neither called the New Harlem Cab Service on January 19, 1995, at approximately 3:40 a.m. to order a cab to go to the Bronx, nor used the name "Yvette," the Defendant Donnelly insisted that she made the telephone call and that she was "Yvette."

33.   The Defendant Donnelly decided that Ms. Watkins, in denying she made the call and that she was Yvette, was lying and was

9

involved in the murder of Baithe Diop despite the absence of any evidence that she had anything to do with the robbery and murder.

34.  The defendants knew there was no evidence of Ms. Watkins' involvement in the Diop murder and no probable cause to charge her in the case, and that the only way they could charge her was by placing her at the scene as an active participant in the robbery and murder of Mr. Diop.

35.  To place Ms. Watkins at the scene, the defendants fabricated an identification procedure which allegedly occurred on February 1, 1995, in which a purported eyewitness to the shooting of Mr. Diop, Miriam Taveras, allegedly identified the plaintiff's photograph, the Polaroid photo taken on January 21, 1995, from an array of photographs of black women as being that of an individual who emerged from the Diop vehicle immediately preceding the shooting of Mr. Diop. In fact, Taveras never picked out Ms. Watkins' photo from a photo array and she had never seen her in her life. On the same day the defendants fabricated a false oral statement by Ms. Taveras, placing Ms. Watkins in the Diop taxi at the scene and participating in the robbery and murder.

36.  On the same day, February 1, 1995, the defendants fabricated an identification procedure with an individual by the name of Cathy Gomez in which Ms. Gomez allegedly identified Ms. Watkins' photograph from a photo array, as an individual she had seen with Eric Glisson, Michael Cosme and Devon Ayers, who all were

also charged with the Diop murder, in her neighborhood before the murder. Gomez, just like Taveras, never selected Ms. Watkins' photo from a photo array and had never seen Ms. Watkins in her life.

37.   Ms. Watkins had never been to the Bronx neighborhood where the murder of Diop occurred and had never met any of the other individuals charged in connection with her case. Ms. Watkins met her co-defendant Eric Glisson for the first time in court following her indictment.

38.   The defendants were able to get Taveras and Gomez to give their false identification and false oral statements through manipulation by feeding them facts, bribing them with favors and rewards, coercion, and threats to ensure they stuck to the stories created.

39.   Having fabricated both an identification of Ms. Watkins by Taveras and an oral statement by Taveras implicating Ms. Watkins, the Defendant Donnelly created false notes which purported to memorialize Taveras' identification implicating Ms. Watkins in the Diop murder and false notes concerning Cathy Gomez's identification of Ms. Watkins.

40.   Miriam Taveras was a homeless drug addict who the defendants manipulated by feeding her facts, coerced, and threatened in order to make their false case against Ms. Watkins and the other individuals charged along with her in connection with the Diop murder, despite the fact that there existed no evidence of the

plaintiff's involvement in the robbery and murder.

41.   Ms. Tavaras allegedly observed the shooting of the driver from a distance of 250 feet from a vantage point where it was virtually impossible to observe the scene where she alleged Mr. Diop was shot. She repeatedly changed her story about what she observed and from where she observed it. She also repeatedly changed her story as to whom she observed, adding participants to the murder, including Ms. Watkins, at the urging of the defendants despite the fact that none of the individuals she named and identified as participating in the robbery and murder of Mr. Diop actually were present or participated in the crime.

42.   In truth the defendants had knowledge that there was absolutely no evidence that Ms. Watkins was ever present in the Bronx neighborhood where the Diop murder occurred and no evidence other than that which they fabricated, i.e., that Ms. Watkins was in the Diop taxicab and participated in Diop's murder.

43.   The defendants presented their fabricated identification and false statement of Taveras implicating Ms. Watkins to the prosecutors without ever telling them of their fabrication in order to obtain a determination from the prosecutors that there was "probable cause" to charge Ms. Watkins with the Diop murder.

44.   After obtaining the determination of probable cause to arrest Ms. Watkins, the defendants continued to manipulate by feeding facts, rendering reward, bribes, and by coercing and

threatening Taveras to ensure that she stuck to her fabricated identification and fabricated oral statement, and on February 17, 1995, after once again informing Taveras exactly who she was to identify, had Taveras identify Ms. Watkins in a lineup at the 48th Precinct in the Bronx despite the fact that Taveras had never before seen Ms. Watkins.

45.   On the same date the defendants manipulated by feeding facts, rewarded, bribed, coerced and threatened Gomez in presenting to her a single photo of Ms. Watkins before she viewed the lineup so that she would know whom to identify in the lineup. Through their manipulation and fabrication of the lineup, Gomez identified Ms. Watkins as the person she had seen in the neighborhood with others allegedly involved in the Diop murder, when in fact Gomez had never seen Ms. Watkins prior to attending the lineup.

46.   After almost 18 years of wrongful imprisonment, in the spring of 2012 proof positive of the claimant Cathy Watkins' actual innocence was discovered with the disclosure of the investigation conducted by the U. S. Attorney's Office for the Southern District of New York that two individuals who had cooperated with the office, Gilbert Vega and Jose Rodriguez, were guilty of murdering Baithe Diop.

47.   Both Gilbert Vega and Jose Rodriguez were members of the street gang known by the name of "Sex, Money, Murder" [hereinafter "SMM"] and they each became cooperating witnesses with the United

States following their arrests by the federal authorities for their criminal activities in connection with SMM. As part of their cooperation, they both were required to detail all of their criminal activity and they each eventually admitted to the federal authorities their involvement in the robbery and shooting of a livery cabdriver on Croes Avenue, Bronx, New York, and pled guilty in the United States District Court for the Southern District of New York to separate Informations charging federal offenses in connection with the shooting.

48.   In 2003, after finding out about the shooting of the cabdriver first from Vega then from Rodriguez, the federal authorities tried to find a record of a livery driver shooting on Croes Avenue, which is in the 43rd Precinct, where Vega and Rodriguez said the shooting occurred, but the officers at the 43rd Precinct to whom the federal authorities spoke reported they could not connect what Vega and Rodriguez were describing to any victim or incident.

49.   The victim in Ms. Watkins' case, Baithe Diop, was a black man from Senegal in western Africa. Gilbert Vega told federal investigators that the livery taxi driver he shot was a dark-skinned man who appeared to be African.

50.   Jose Rodriguez told federal investigators the driver he shot was a black man whom he believed was African.

51.   In separately pleading guilty to federal offenses in

connection with the shooting of the livery cabdriver both Vega and Rodriguez, after being sworn, admitted that they each possessed a handgun and that they each shot the driver one time. <u>United States</u> v <u>Gilbert Vega</u>, dated July 22, 2003, 01 CR 490, before Michael H. Dolinger, U.S.D.J., p. 20-11 to 21-3; <u>United States</u> v <u>Jose Rodriguez</u>, dated January 24, 2008, 97 CR 1293, before Miriam Goldman Cedarbaum, U.S.D.J.

52.  The admissions and pleas of guilty of Vega and Rodriguez, as well as Vega's testimony as a government witness in other cases, are in complete conformity to the medical and ballistics evidence in the Diop murder, making it clear that their shooting of the African livery cabdriver is the shooting of Baithe Diop.

53.  Further establishing that Vega and Rodriguez are describing the shooting of Baithe Diop is Rodriguez's description of the area of the driver's body where they shot him which matches perfectly with the medical evidence in the Diop murder. When asked by the Judge where the victim was shot he stated, "It was dark and he might have been hit in the side. And in his back."

54.  Dr. Josette Montas, who performed the autopsy on Baithe Diop, testified that he suffered two gunshot wounds, "One...to the back of the neck and upper shoulder area, and one...to the right side of the abdomen." Detective Anthony Tota, the People's ballistic expert, examined two .38 caliber bullets recovered during the autopsy of Baithe Diop and concluded "Sure as I'm sitting here" that

the bullets were fired into Mr. Diop from two separate guns.

55.  The wounds to Mr. Diop were also consistent with the positions of Vega and Rodriguez in the vehicle and consistent with Rodriguez inflicting the wound "to the right side of the abdomen" and Vega the wound "to the back of the neck."

56.  In giving the factual basis for his guilty pleas, Rodriguez stated he was "at an angle" to the driver in the rear passenger side seat and Vega was directly behind the driver and "placed the pistol behind him." Vega, in testifying on May 6, 2009, as a government witness in the case of <u>United States</u> v <u>Jason Camacho</u>, 06-Cr-129, United States District Court, Southern District of New York, stated, "I was sitting right behind the cab driver in the back seat, it [my gun] was facing toward him."

57.  Further establishing that Vega and Rodriguez murdered Baithe Diop is the fact the Diop murder is the only murder of an African livery cabdriver who was shot two times by two different weapons to have occurred in the early morning hours on Croes Avenue between Lafayette and Seward Avenues in the Bronx, New York in and around 1994-1995.

58.  It was only after the United States Attorney's Office was asked to investigate the murder in a letter from Ms. Watkins's co-defendant Eric Glisson dated April 11, 2012, in which he proclaimed his innocence and that he heard the murder was committed by SMM members, that the truth emerged.

59.   Investigator John O'Malley, based on his involvement with his office's prosecution of members of SMM and his participation in the debriefings of Vega and Rodriguez, "immediately recognized Glisson's general description of the crime as matching the robbery and shooting to which Vega and Rodriguez had confessed." His subsequent investigation, which included additional interviews of Vega and Rodriguez, determined to a certainty that the murder of the unknown livery cabdriver that Vega and Rodriguez admitted to and pled guilty to was, in fact, the murder of Baithe Diop.

60.   Investigator O'Malley also determined that it was the girlfriend of Rodriguez who lived at 30 W. 141st Street who actually made the telephone call to New Harlem Car Service to which Mr. Diop responded, picking up Vega and Rodriguez.

<u>CRIMINAL TRIAL</u>

61.   Ms Watkins was tried jointly with Eric Glisson in September 1997 and convicted of felony murder.

62.   At trial the defendants produced Nicole Carter as a witness for the prosecution and she testified she was a dispatcher for the New Harlem Car Service and received the telephone call requesting a cab to which Mr. Diop responded. She testified she believed the caller, based on her voice, was a woman she knew from previous calls as Yvette, but that the caller did not identify herself by name and she did not ask the caller for her name. Ms. Carter admitted she had not received a call from the woman she knew

17

as Yvette since August of 1994, that she "never" had a friendly type conversation with the person she knew as Yvette and when she said to the caller "you haven't called for a while," the caller's response was not one of familiarity but only "uh-huh." Ms. Carter testified she identified Ms. Watkins' voice in the 43rd Precinct on January 22, 1995, as Yvette's when Ms. Watkins made the call requested by the Defendant Donnelly.

63. Nicole Carter, who testified at Ms. Watkins' trial in 1997, did not look anything like the woman who appeared at the 43rd Precinct on January 22, 1995 accompanied by the cabdriver.

64. The only inculpatory evidence presented by the prosecution that Ms. Watkins was involved in the robbery and murder of the victim was the testimony of Taveras that Ms. Watkins emerged from the Diop vehicle and then gave a hand signal, interpreted to mean kill the driver, whereupon the driver was shot and killed. The prosecution's case against Ms. Watkins was entirely fabricated through a witness that had been fed facts and manipulated, coerced and threatened by the defendants.

65. Ms. Watkins testified in her own defense explaining her whereabouts, in her apartment, on the night and morning of the crime and that she did not call for a taxi on January 19, 1995, at 3:40 a.m. Ms. Watkins further testified that she never attempted to disguise her voice at the 43rd Precinct during the mock telephone call, and that when she first made the call the Defendant Donnelly

18

was screaming at her.

66.   On September 27, 1997, Ms. Watkins was wrongly convicted of the felony murder of Baithe Diop.

67.   On October 24, 1997, Ms. Watkins was sentenced on her conviction to life imprisonment with a minimum sentence of 25 years imprisonment.

<u>DAMAGES</u>

68.   The actions of the defendants deprived plaintiff of her civil rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the laws of New York.

69.   The unlawful, intentional, willful, deliberately indifferent, reckless and/or bad-faith acts and omissions of the defendants caused Cathy Watkins to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted and forced to serve nearly eighteen years in jail and prison for a crime she did not commit.

70.   The unlawful, intentional, willful, deliberately indifferent, reckless and/or bad-faith acts and omissions of the defendants caused Cathy Watkins the following injuries and damages that continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships, including the loss of relations with her child and grandchildren; severe psychological

19

damage; damage to business and property; loss of income; costs of defense; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment and expression, for which she is entitled monetary relief.

71.  All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

<u>COUNT ONE</u>

42 U.S.C. § 1983 4th and 14th Amendment Claims
for Malicious Prosecution

72.  Plaintiff hereby incorporates paragraphs 1 through 71 as if fully set forth herein at length.

73.  Defendants, despite knowing that probable cause did not exist to arrest and prosecute Ms. Watkins for the robbery and murder of Baithe Diop, acted with malice individually and in concert to cause Ms. Watkins to be arrested, charged and prosecuted for that crime, thereby violating Ms. Watkins' rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution.

74. Specifically, defendants intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Ms. Watkins, including but not limited to the fact that Miriam Taveras' statements implicating Ms. Watkins, witness statements purportedly connecting Ms. Watkins to the crime and other evidence against Ms. Watkins were the product of fabrication and/or coercion. The defendants performed the above-described acts deliberately, with reckless disregard or indifference for the truth and with malice.

75. In fact, Ms. Watkins, as she has stated at all times both preceding and after her arrest and maintained throughout her wrongful incarceration, is innocent of the robbery and murder of Baithe Diop.

76. On December 13, 2012, the prosecution terminated in Ms. Watkins' favor when the Bronx County District Attorney dismissed the charges against her.

77. Ms. Watkins' cause of action for malicious prosecution was unavailable to her until December 13, 2012, upon the favorable termination of the criminal proceedings against her. Furthermore, the claim is tolled as defendants concealed from Ms. Watkins – and still are concealing to this day – the facts vitiating probable cause to arrest and prosecute her.

78. But for defendants' unlawful and malicious conduct Ms. Watkins would not have been arrested and/or prosecuted and /or

convicted for the robbery and murder of Baithe Diop.

79.   Defendants' actions depriving Ms. Watkins of her liberty without probable cause were in violation of clearly established constitutional law and no reasonable police officer in 1995 would have believed that the defendants' actions were lawful.

80.   As a direct and proximate result of the defendants' actions, Ms. Watkins was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

<u>COUNT TWO</u>

42 U.S.C. § 1983 14th Amendment Claims for Deprivation of
Liberty Without Due Process of Law and Denial of a
Fair Trial by Fabricating Evidence and Coercion

81.   Plaintiff hereby incorporates paragraphs 1 through 81 as if fully set forth herein at length and further alleges as follows.

82.   Defendants, acting individually and in concert, coerced witnesses and fabricated evidence depriving Ms. Watkins of her clearly established constitutional right pursuant to the Fourteenth Amendment to a fair trial and due process of law.

83.   Specifically, defendants deliberately, with reckless disregard for the constitutional rights of Ms. Watkins, fed facts to and manipulated, bribed, rewarded, coerced and threatened Miriam Taveras, Cathy Gomez and other witnesses to obtain fabricated statements from them, in a manner that shocks the conscience, to procure those statements, and by falsely representing in police

22

reports, in pretrial conversations with prosecutors, and during Ms. Watkins' trial that the facts recounted by those witnesses originated with the witnesses when in fact they had been fed to the witnesses or otherwise fabricated by the defendant police officers.

84. Furthermore, the defendants, deliberately and with reckless disregard or indifference for the constitutional rights of Ms. Watkins, failed to disclose to prosecutors their coercion and fabrications and attempted coercion and fabrications, including but not limited to witness statements and investigative misconduct on the part of the defendants and others. Had this evidence been documented and/or disclosed it would have tended to prove Ms. Watkins' innocence, cast doubt on the entire police investigation of the Diop robbery and murder, impeached the trial testimony of critical witnesses, and undermined confidence in the verdict against Ms. Watkins. But for defendants' actions, Ms. Watkins would not have been indicted for or convicted of the robbery and murder of Mr. Diop.

85. Ms. Watkins' cause of action for denial of her liberty without due process of law and for denial of her right to a fair trial were unavailable to her until December 13, 2012 upon the favorable termination of the criminal proceedings against her. Furthermore, these claims are tolled as defendants concealed from Ms. Watkins – and still are concealing to this day – the coercion of witnesses, fabrication of evidence, deliberate failure to

investigate and other facts giving rise to these claims.

86. Defendants' conduct violated Ms. Watkins' clearly established constitutional right to a fair trial and not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1995 would have believed that the actions taken by the defendants in feeding facts to witnesses and manipulating, bribing, rewarding, coercing and threatening witnesses in order to fabricate evidence were lawful. As a direct and proximate result of defendants' actions, Ms. Watkins was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

<u>COUNT THREE</u>

42 U.S.C. § 1983 Claim for Failure to Intercede

87. Plaintiff hereby incorporates paragraphs 1 through 86 as if fully set forth herein at length and further alleges as follows.

88. By their conduct and under color of state law, defendants had opportunities to intercede on behalf of Ms. Watkins to prevent her malicious prosecution, lack of a fair trial, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

89. Defendants' failures to intercede violated Ms. Watkins' clearly established constitutional rights to not be maliciously

prosecuted, denied a fair trial and deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1995 would have believed that failing to intercede to prevent defendants from feeding facts to, manipulating, bribing, rewarding, coercing and threatening alleged witnesses to fabricate evidence and cause Ms. Watkins to be arrested and prosecuted without probable cause were lawful. As a direct and proximate result of the defendants' failures to intercede, Ms. Watkins was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

<u>COUNT FOUR</u>

42 U.S.C. § 1983 Civil Rights Conspiracy Claim

90.   Plaintiff hereby incorporates paragraphs 1 through 89 as if fully set forth herein at length and further alleges as follows.

91.   Defendants Donnelly, Aiello, Nieves and John Does #1-10, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals not within the employ of the New York Police Department or New York City to act in concert in order to deprive Ms. Watkins of her clearly established Fourth and Fourteenth Amendment rights to be free from malicious prosecution, deprivations of liberty without due process of law, and a fair trial.

92.   In furtherance of the conspiracy each defendant engaged

in and facilitated numerous overt acts, including, without limitation, the following:

A. Defendants Donnelly, Aiello, Nieves and others procured, through coercion, intimidation, and feeding of facts, Ms. Taveras' statement implicating Ms. Watkins in the Diop robbery and murder, despite the fact that they knew or should have known that Ms. Watkins had no involvement in the crime.

B. Defendants Donnelly, Aiello and Nieves and others procured, through coercion, intimidation and feeding of facts Ms. Gomez's identification of Ms. Watkins and thereby implicating her through association in the Diop robbery and murder, despite the fact that they knew or should have known that Ms. Gomez had never seen Ms. Watkins before her purported identification of her.

C. Defendants deliberately fabricated reports, both written and oral, and other accounts of their investigative activities.

D. Defendants John Does #1-10 authorized the decision to arrest Ms. Watkins, notwithstanding that they knew or should have known that defendants Aiello, Donnelly, Nieves and others had conducted their investigation in a manner that violated the constitutional rights of Ms. Watkins.

E. Defendants Donnelly, Aiello, Nieves and John Does #1-10 had an opportunity to disclose and report the ongoing conspiracy and the opportunity to otherwise prevent the overt acts committed in furtherance of the conspiracy, but failed to do so, despite knowing

that the acts were unlawful and would result in the wrongful prosecution, conviction and imprisonment of Ms. Watkins.

93.   As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Ms. Watkins was wrongly convicted and imprisoned for nearly eighteen years and suffered the other grievous and continuing injuries and damages as set forth above.

<u>COUNT FIVE</u>

State Law Malicious Prosecution Claim

94.   Plaintiff hereby incorporates paragraphs 1 through 93 as if fully set forth herein at length and further alleges as follows.

95.   The defendants, despite knowing that probable cause did not exist to arrest, charge and prosecute Ms. Watkins for the robbery and murder of Mr. Diop, intentionally, recklessly and with malice caused Ms. Watkins to be arrested, charged, prosecuted and convicted for Diop's robbery and murder.

96.   The defendants intentionally withheld from, and misrepresented to, prosecutors and the grand jury material exculpatory facts that further vitiated probable cause against Ms. Watkins including but not limited to the fact that the evidence implicating Ms. Watkins was the product of fabrication, the feeding of information to Taveras and Gomez, and coercion, threats and manipulation of the alleged witnesses.

97.   Ms. Watkins' cause of action for malicious prosecution was

unavailable to her until December 13, 2012, upon the favorable termination of the criminal proceedings against her.

98.  The Defendants' conduct directly and proximately caused Ms. Watkins' wrongful conviction and nearly eighteen years of imprisonment, as well as the other grievous and continuing injuries and damages set forth above.

### COUNT SIX

State Law Respondent Superior Claim Against
City of New York for Malicious Prosecution

99.  Plaintiff hereby incorporates paragraphs 1 through 98 as if fully set forth herein at length and further alleges as follows.

100. At all times relevant to this complaint the individual defendants acted as agents of, and in the scope of their employment with, the City of New York. The conduct by which defendants committed the tort of malicious prosecution was undertaken while defendants were on duty, carrying out their routine investigative functions as New York Police Department detectives or officers, and engaging in such conduct as would have been reasonably expected by their employer.

101. The City of New York is liable for its agents' state law tort of malicious prosecution under the doctrine of respondeat superior.

<u>COUNT SEVEN</u>

State Law Claim for Intentional or Reckless
Infliction of Emotional Distress

102. Plaintiff hereby incorporates paragraphs 1 through 101 as if fully set forth herein at length and further alleges as follows.

103. The conduct of defendants in deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest, prosecution and incarceration of Ms. Watkins was extreme and outrageous and directly and proximately caused the grievous and continuing injuries and damages set forth above.

104. Ms. Watkins' cause of action for intentional or reckless infliction of emotional distress by defendants was unavailable to her until December 13, 2012, upon the favorable termination of the criminal proceedings against her. Furthermore, this claim is tolled as defendants concealed from Ms. Watkins – and still are concealing to this day – their conduct giving rise to this cause of action.

<u>COUNT EIGHT</u>

State Law claim for Negligent Infliction
of Emotional Distress

105. Plaintiff hereby incorporates paragraphs 1 through 105 as if fully set forth herein at length and further alleges as follows.

106. The defendants negligently and grossly negligently, and in breach of their duties owed to her to refrain from fabricating evidence, coercing witnesses, withholding material exculpatory and impeachment evidence, and otherwise acting to deny them due process

of law, directly and proximately caused Ms. Watkins, who was innocent, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for nearly eighteen years. Defendants' actions caused Ms. Watkins to suffer physical harm, including physical ailments resulting from the circumstances and duration of their wrongful incarceration, and to fear for her physical safety throughout the period of her pretrial and post-conviction incarceration.

107. Ms. Watkins' cause of action for negligent infliction of emotional distress by defendants was unavailable to her until December 13, 2012, upon the favorable termination of the criminal proceedings against her. Furthermore, this claim is tolled as the defendants concealed from Ms. Watkins – and still are concealing to this day – their conduct giving rise to this cause of action.

WHEREFORE, Cathy Watkins prays as follows:

A. That the Court award compensatory damages to her and against defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to her and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of her costs, including reasonable attorney's fees pursuant to 42

U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.   For any and all other relief to which she may be entitled.


Dated: February 11, 2014          Respectfully submitted,


/s/ Paul Casteleiro
_____
PAUL CASTELEIRO (PC 0092)
200 Washington Street
5th Floor
Hoboken, NJ 07030
201-656-1696


/s/ W. James Cousins
_____
W. JAMES COUSINS (JC 8100)
3 Strawberry Ridge Road
Ridgefield, CT 06877
203-438-9136

Attorneys for Plaintiff
Cathy Watkins